**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **DAVID THOMAS DRINNON,** § | | |
| Plaintiff § | | |
| § | | |
| **vs.** § | | **CIVIL ACTION NO. 7:11-CV-45-O- KA** |
| § | | |
| **MICHAEL J. ASTRUE** § | | |
| **COMMISSIONER OF SOCIAL** § | | |
| **SECURITY ADMINISTRATION,** § | | |
| Defendant § | | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

By Order Referring Case (Docket No. 5) this case was referred to the undersigned United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b) and Rule 72 of the Federal Rules of Civil Procedure for hearing, if necessary, and recommendation or determination.

Factual and Procedural Background[1]

This is a Social Security appeal whereby Plaintiff David Thomas Drinnon seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Drinnon alleges that he is disabled as a result of numerous disabling conditions. In his application for disability income ("DI") benefits, he listed his impairments as "Neck Injury, Hemochromotosis, Diabetis, High Blood Pressure, Hypertension, Irregular Heart Beat, and

---

[1] The following background comes from the transcript of the administrative proceedings which is designated as "Tr." in the citations and footnotes and from agreed statements in the parties' briefs.

Depression."[2] He claimed an on-set date of October 12, 2007 when he claimed he became unable to continue his work as a Federal Express driver (courier) because of these conditions that arose following a motor vehicle collision. After his application was denied initially and on reconsideration, on November 21, 2008 Plaintiff requested a hearing before an administrative law judge (ALJ). That hearing was held on June 10, 2009. At the time of the hearing Plaintiff Drinnon was 47 years of age with a high school education. His past relevant work was found to have been as a courier for Federal Express and as an automobile service department manager.

The Decision Making Process

"Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.,* and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416(SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994)."

"The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C.§§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel,* 168 .3d 152, 154 (5th Cir.1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§

---

[2] Tr. 112.

404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler,* 752 F.2d 1099, 1101 (5th Cir.1985), *cited in Loza v. Apfel,* 219 F.3d 378, 392 (5th Cir.2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*"[3]

## The Decision

At Step One in the five step sequential disability evaluative process,[4] the ALJ determined that except for one unsuccessful work attempt Drinnon had not engaged in substantial gainful activity since the alleged on-set date.[5] Proceeding to Step Two in the process, the ALJ determined that Drinnon had a combination of severe impairments arising from his chronic neck pain due to

---

[3] From *Seibert v. Astrue*, 2010 WL 6389303, CA 4:09-CV-90-A (J. Cureton, N.D. Tex. 2010).

[4] The process succinctly and accurately summarized and annotated in the article by Magistrate Judge Morton Denlow and titled *"Substantial Evidence Review in Social Security Cases as an Issue of Fact,"* 2007 Fed. Cts. L. Rev. 3, 4-5 (2007)..

[5] ALJ's Decision, Tr.16.

3

degenerative disc disease and chronic knee pain, which cause significant vocationally relevant limitations.[6] At Step Three the ALJ determined that neither alone or in combination did these two impairments meet the "Listed Impairments."[7] This necessitated that the ALJ conduct an analysis of the effects of these impairments upon Drinnon's capacity to perform meaningful work, that is, to determine Drinnon's residual functional capacity ("RFC") in this Step Four of the evaluative process. In making his RFC analysis in his decision, the ALJ summarized in detail the extensive medical reports from Drinnon's examining and treating physicians, tracking the progress of his treatment from the time of the Drinnon's initial treatment in the emergency room at the Eastland hospital following the automobile accident through the following eighteen months of treatments for his neck and knee injuries and pain. He acknowledged his review of the medical records provided by Drinnon's primary care physician, Mousin Syed, MD, for a number of conditions unrelated to the two impairments arising from the auto accident. He also considered but discounted the reported determinations made by the state agency medical consultants made after the disability application was filed finding that much of the medical records had been unavailable to them. And, finally, the ALJ considered Drinnon's own subjective complaints and evidence of pain and disability as testified by him finding that Drinnon's "statements concerning his impairments and their impact on his ability to work are not substantiated by the objective medical evidence beginning October 12, 2007."[8]    Following his RFC analysis, at Step Five the ALJ concluded that Drinnon's residual functional capacity was reduced by the two impairments to less-than-sedentary work, due to his

---

[6]     *Id.*

[7]     *Id*. at 16.

[8]     Tr. 20, finding No. 4.

4

inability to perform sustained work activity during his rehabilitation.[9] As a result of this determination, the ALJ concluded that Drinnon was disabled beginning on the onset date of October 12, 2007.

However, the ALJ then noted that during the course of Drinnon's treatment for the two impairments, one of Drinnon's treating physicians, Dr. Gary L. Heath, on April 29, 2009, indicated in his report of that day[10] that, following Drinnon's undergoing a series of epidural steroid injections (ESI) and a nerve root block, Drinnon appeared to have experienced a 50-60% improvement.[11] Relying upon that report and on Drinnon's hearing testimony that he was doing college work, the ALJ concluded that Drinnon had experience significant medical improvement as of April 29, 2009. He concluded that such improvement related to his ability to work with the result that he had regained the exertional functional capacity to perform that sedentary work. Therefore, he concluded that Drinnon was no longer disabled as of April 29, 2009. Since subsequent review of this determination to the Appeals Council was unavailing, Plaintiff has appealed the final decision of the Commissioner.

Standards for Court Review

"A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir.1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir.1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001). It must be

---

[9] *Id.* at 19 and 20.

[10] Heath report, the fourth of four such reports, Tr. 449.

[11] *Id.*

more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither re-weigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000); *Hollis,* 837 F.2d at 1383."[12]

Plaintiff's Assertions

Drinnon challenges the ALJ's whole evaluative process because the ALJ wholly failed to address or consider Drinnon's depressive mental condition as an impairment either alone or in combination with Drinnon's recognized knee and neck injuries and pain impairments. Drinnon alleges that there was spread upon the medical records before the ALJ a multitude of references to Drinnon's depressive mental condition and the drug treatment for it. At least, says Drinnon, there were enough such references to create a suspicion of a mental impairment so as to trigger the duty of the ALJ to initiate a fuller development of the record, especially since Drinnon had claimed "depression" as an impairment in his application for benefits.[13] He asserts that had the ALJ considered the evidence of Drinnon's mental condition, the ALJ would <u>not</u> have found an improvement in Drinnon's RFC and the ALJ's final determination would have been that Drinnon's disability continued after April 29, 2009.

Secondly, Drinnon challenges the ALJ's finding that his condition had improved to a point of restoring his RFC to perform sedentary work again. He argues that in concentrating on Dr. Heath's last report indicating the supposed improvement in Drinnon's neck pain, the ALJ failed to consider the continuing physical limitations on Drinnon's work capacity due to his unimproved knee

---

[12]     *Seibert v. Astrue*, *supra* note 3.

[13]     Drinnon Application, Tr. 112.

pain. It was this knee pain which Drinnon asserted limited his sitting capacity to no more than 40 minutes thereby reducing his residual functional capacity below that required for sedentary work.

Thirdly, Drinnon further urges that there was not sufficient evidence in the record to support the ALJ's "improvement" finding since the only two legs supporting the ALJ's finding, the Heath April 29 report and the testimony that Drinnon was taking a college course <u>on the internet,</u> were no support at all. Drinnon argues that this is especially so, since the ALJ made a legal error when he failed to use that part of the mandated eight-step evaluation standard that required the ALJ to make a comparison of the symptoms of the former severe condition(s) with the claimant's then current conditions, each in so far as they relate to the claimant's functional capacity. Drinnon also stresses that generic statements in medical records about Drinnon "getting better" are not evidence of an improvement.

## Commissioner's Responses

Addressing the Plaintiff's assertions, the Commissioner posits that the ALJ did not fail to consider the severity of Drinnon's mental condition because he found that it was not an impairment at all, much less any severe impairment or one creating any non-exertional limitation on Drinnon's RFC. He argues that there was not enough evidence in the record to even raise Drinnon's mental condition as an impairment. Also, Drinnon had to provide objective medical evidence of how his mental impairment and related symptoms affected his ability to work, which he did not. Besides, there was sufficient evidence in the record to demonstrate that Drinnon did not have any mental limitations that affected his ability to work.

Secondly, citing the Heath report, the Commissioner asserts that in the ALJ's tracking of the course of treatments by his treating physicians for the pain from his neck and knee impairments there is sufficient evidence in the record to support the ALJ's determination that Drinnon

experienced such an improvement in his condition as to restore his RFC to perform sedentary work as of April 29, 2009. Especially because Drinnon wholly failed to produce any objective evidence of any physical limitations resulting from his impairments after the April 29, 2009 Heath report of improvement.

Third, citing the *Leggett* case,[14] Drinnon failed to discharge his burden to prove his mental condition was an impairment warranting analysis by the ALJ since he never raised it as an issue. In fact, in his application for benefits Drinnon marked a "No" to a question as to whether he had "mental or emotional problems that limit what you are able to do."[15] The ALJ's duty to develop the record did not arise because Drinnon never raised his mental condition as a limitation on his capacity to perform work and isolated, "*de minimis*" remarks in the record were insufficient to raise a suspicion either. Because Drinnon never raised the issue of a mental impairment until this appeal, Drinnon cannot say that he put his mental impairment before the ALJ.

Finally, the Commissioner argues that although the ALJ's decision did not expressly recite that he used the regulatory eight-step process[16] for determining whether there was improvement in this non-termination case, the record shows that he did use it; besides it is "harmless" error, if any, if he did not use it, because there is still substantial evidence in the record to support such a determination. Plus, the 5th Circuit has not definitively ruled that the eight-step process applies in "closed period" cases like this one.

## Medical Improvement Determinations

In a benefits termination proceeding, the Commissioner bears the burden of proof and may

---

[14] *Leggett v. Chater*, 67 F.3d 558 (5th Cir. 1995).

[15] Tr. 141.

[16] 20 C.F.R. § 404.1594(f).

terminate benefits if substantial evidence demonstrates (1) that the claimant has undergone medical improvement related to her ability to do work, and (2) that the claimant is currently able to engage in substantial gainful activity. *Griego v. Sullivan*, 940 F.2d 942, 943-44 (5th Cir. 1991); followed in *Wilson v. Barnhart*, 129 Fed. Appx. 912, (5th Cir. 2005). However, the Commissioner asserts that the 5th Circuit has not yet definitively ruled that the eight-step evaluative process applicable to a termination case also applies in "closed period" cases. I find that this issue was laid to rest in *Waters v. Barnhart*, 276 F.3d 716 (5th Cir. 2002) wherein the court reviewed decisions from four other circuits that had held that the medical improvement standard <u>does apply</u> to cases involving a closed period of disability cases.[17] Distinguishing several of the 5th Circuit's own prior decisions,[18] the court stated "we think our sister circuits' approach is more persuasive than that suggested by the *Richardson* dicta... we follow the Tenth, Seventh, Eleventh and Third Circuits in holding that the medical improvement standard applies to the cessation date in closed period cases." *Waters*, p. 719.

Where an issue is presented whether a claimant's impairments have "improved" the regulations proscribe an <u>eight-step</u> evaluative process.[19] Section 404.1594(b)(1) of the regulations defines a "medical improvement" as follows:

> "(1) Medical improvement. Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528)."

---

[17] *Shepherd v. Apfel*, 184 F.3d 1196, 1200 (10th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993); *Chrupcala v. Heckler*, 829 F. 2d 1269, 1274 (3rd Cir. 1987); and *Pickett v. Bowen*, 833 F. 2d 288, 292 (11th Cir. 1987).

[18] *Richardson v. Bowen*, 807 F2d 444, 445 (5th Cir. 1987) and *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).

[19] 20 C.F.R. §404.1594(b) and (f).

The eight steps of the evaluative process are then set out in length in the eight subparts of subsection (f). Looking at that subsection, Steps 1 and 2 are essentially the same steps in the five-step evaluative process. However, at Step 3 there is the first reference to a "medical improvement." This Step 3 creates a diversionary path that inquires whether a medical improvements exists as shown by a decrease in medical severity. At this point following steps 4 through 6 through the evaluation process requires a complex set of positive and negative deductions referencing multiple sections and subsections of the regulations as to whether and how the supposed "improvement" affects the claimant's residual functioning capacity. This then leads to a determination of whether the impairments are or are not severe. And this ultimately leads in Step 7 to a determination of whether the severe impairment(s) affect the claimant's capacity to perform his past relevant work. If so, then in Step 8 a determination is made whether the claimant is capable with his limitations to perform work other than his past relevant work that is available in the national economy.[20]

Medical Improvement Issue

In his decision the ALJ expressly referenced the five-step process proscribed in the regulations in his evaluation of the evidence.[21] He then structured the recitation of his evaluations and findings in those five steps over three and one half pages reaching a conclusion that beginning October 12, 2007, Drinnon's RFC "was reduced to less than sedentary work due to his inability to perform sustained sedentary work during his rehabilitation."[22]

Turning to an issue of improvement, I find that the ALJ did expressly reference that

---

[20]   As is determined in the final step in the five-step evaluation process.

[21]   Tr. 16, first paragraph.

[22]   Tr. 16-19.

section of the regulations defining "medical improvement" and attempted to summarize in his own words the steps three through six of the eight-step improvement algorithm.[23] Though acknowledging the medical improvement definitional section of the regulations,[24] the ALJ did not expressly reference the regulation subsection that incorporated the eight-step process.[25] Most critically, though correctly noting that any decrease in the medical severity of a claimant's impairment must be related to the claimant's ability to work, the ALJ focused on a medical improvement that <u>does not</u> so relate, again referencing only the definitional subsection (b).[26] Clearly, the ALJ was aware of the "definitional" strictures applicable to evaluating any medical improvement but appears not to be aware of the additional steps in the eight-step evaluative process by which those determinations are to be made. Most critically, I find that it is clear that the ALJ did not expressly articulate that he followed steps 3 through 6 of that eight-step process. I find that it is unclear from a reading of his whole decision whether the ALJ in fact used that mandated process to arrive at his conclusion that Drinnon had attained a "medical improvement" as of April 29, 2009 or just jumped to that conclusion. Since the record does not disclose whether the proper evaluative process was used, it is unclear as to what evidence the ALJ would have considered or what determinations the ALJ would have made, had he used the process. While this may be perceived as being only a "procedural" error, not justifying alone a remand, I find that the failure to articulate and apply the very decision-making steps mandated for determining this critical issue resulted in prejudice to Drinnon. It is not clear from the evidence that

---

[23]  Tr. 19, paragraph 3.

[24]  Subsection (b)(1) of §404.1594.

[25]  Subsection (f) of §404.1594.

[26]  Tr. 19, paragraph 4, "work over the internet."

11

Drinnon's knee and neck pain had been ameliorated to such extent that they no longer impacted his capacity to perform sedentary work.

There were only two evidentiary matters recited by the ALJ in reaching his conclusion on this improvement issue. They were the Heath report[27] and the Drinnon's hearing testimony that he was taking classes at a junior college by internet for retraining purposes.[28] Drinnon fairly opines that taking online college courses in front of a computer at home (as so testified by Drinnon)[29] is distinguishable from participating in on-campus college courses (as highlighted in the two cases cited by the Commissioner.)[30] As to his impairments while taking the on-line courses using his computer Drinnon intimated that the pain from his knee created a non-exertional limitation on his capacity to perform the sedentary college work. Drinnon testified "You know, that's one thing with your on-line courses you can get up and down when necessary. You know, I'm not going to sit there in front of one for more than 40 minutes without changing some kind of...lay down, elevate my leg, whatever I need to do. ... Dr. Hendricks has told me to, you know, which common sense and he's told me, you know, once your knee starts swelling to elevate you leg."[31] Furthermore, in this context Drinnon also testified that twice in an eight hour day after three hours or so he would have to take a 30-40 minute break to raise his leg due to pain. Also he

---

[27] Tr. 449.

[28] Tr. 27.

[29] Tr. 28.

[30] *Tindell v. Barnhart*, 444 F.3d 1002 (8th Cir. 2006) and *Tennant v. Apfel*, 224 F.3d 869 (8th Cir. 2000).

[31] Tr. 28.

testified that after an hour of sitting his knee "will get stiff and it will get hard–...after an extended period of an hour I have trouble."[32]  This testimony of the claimant certainly calls into question the weight the ALJ placed upon this circumstance in his improvement analysis.

The statements in the Heath Reports upon which the ALJ strongly relies are hardly a sufficient foundation to support an improvement analysis or finding.  Drinnon argues that Dr. Heath's "goal" of reducing Drinnon's pain, though reached, was not an objective medical finding that Drinnon's condition had improved .  Especially so, since the ALJ did not compare the medical severity of Drinnon's the impairments as of the on-set date to the severity of the impairments as of the date of Heath's last report.

In the first place, seen in the full context of all four of the Heath reports,[33] Dr. Heath's statements were equivocal as to the extent to which the indicated decrease in the level of pain (even to 50-60%) dictated an increase in Drinnon's functional capacity.  While the reports do recite a progression of pain amelioration following treatments over a period of the four months closely preceding the hearing, they do not show or establish a baseline pain level to which such amelioration is referable.  For example, if the base pain level of 100% represented a total capacity to perform sedentary work or if 0% represents a total incapacity to perform such work, does 60% mean that sufficient capacity has been restored?  What level of capacity or incapacity  does 50-60% represent?  Is the relationship between the pain level and the functional capacity linear or geometric or tangential?  Upon what relationship between pain amelioration and functional capacity did the ALJ rely in reaching

---

[32]   Tr. 35.

[33]   Tr. 449-453.

13

his conclusion? The record and the ALJ's decision do not so reflect because the ALJ did not articulate the comparisons as required by the eight-step evaluation standard. Once again, this calls into question the weight the ALJ places upon this circumstance in his improvement analysis.

In his brief the Commissioner calls the court's attention to certain facts that appear from the record; facts not recited by the ALJ himself in his decision, but facts the Commissioner claims supports the ALJ's decision that Drinnon was no longer disabled. As to the Commissioner's assertion that page 457 in the record reflects that Drinnon did not take his medication as prescribed, I find that the ALJ did not make such a reference that Drinnon was not taking all of his pain medication. Neither does Dr. Syed's report on page 457 of the transcript so imply. Rather, the record indicates that Plaintiff doubled up his medication when he received lesser dosage pills than had been prescribed.[34]

As to the Commissioner's observation and argument that Drinnon did not submit evidence that he continued to seek treatment for pain after the date of the last Heath report, I find that there was only a 43 day gap from that report until the hearing. I conclude that this is hardly the type of treatment gap that implies a cure or medical improvement.

As to the Commissioner's observation and argument that Plaintiff testified that he was seeking employment, I conclude that seeking work does not necessarily imply the capacity to fully perform the work.

While this court is instructed not to re-weigh the evidence in determining whether the evidence supporting an ALJ's finding is substantial or is but a mere scintilla, the court must consider the content, character and persuasiveness of the evidence supporting the

---

[34] Tr. 457.

14

proposition. In doing so, I find that the ALJ's determinations that Drinnon's severe impairments had improved by April 29, 2009 to the point that his residual functional capacity to perform sedentary work had been restore is <u>not</u> supported by substantial evidence. The evidence of such improvement is no more than a mere scintilla. Thus, I find that the ALJ's determination that Drinnon is not disabled is not supported by substantial evidence.

### Mental Impairment Issue

It is clear from a reading of the ALJ's decision that beyond an initial listing of "depression" as one of Drinnon's seven alleged impairments[35] and a reference to his primary care physician's medical history notation of "attention disorder and depression,"[36] he made no further comment or analysis concerning Drinnon's mental condition or any treatment therefor. The Commissioner argued that the ALJ "found" that Drinnon's mental condition was not an impairment and so did not perform a severity analysis or consider it in his RFC determination. Any such finding does not appear in the ALJ's decision and therefor must, of necessity, be either implied or be deemed not made. Whether implied or not, citing *Dominique v. Barnhart*,[37] the Commissioner further argues that there was insufficient reference in the record to trigger the ALJ's duty to address the mental condition or to develop the record in regard thereto. In reply, Drinnon argues that there is so much evidence in the record of Drinnon's depressive mental condition as to create a "suspicion" thereof and

---

[35] Tr. 15, paragraph 1.

[36] Tr. 18, paragraph 3.

[37] 388 F.3d 462 (5th Cir. 2004).

thereby trigger the duty of the ALJ to develop the record. In his reply brief, Drinnon cites 21 separate instances in the record where his mental condition and medication therefor were referenced.[38] While this number of references alone would seem to be sufficient to have spurred some interest or at least a mention, they are spread among 300 or more pages of arcane medical reports. Having reviewed each of the cited references, I find that of the 21 citations 12 of them were dated and 9 of them were undated. Of the 12 that were dated, ten of those twelve were made by Dr. Syed, Drinnon's primary care physician. In the three other reports by the three treating physicians who treated Drinnon's neck and knee injuries,[39] the reference to Drinnon's mental condition is located in the past medical history portion of the report and not part of any diagnosis or treatment plan.

Taking the dated Dr. Syed reports in chronological order, the references again appear in the standard past medical history portion but also appear in the current medication sections that reflect treatment by Prozac. The last Syed report reflects an increase in the Prozac dosage due to "more depressed."

Since the burden of proof rests on a claimant to prove an impairment at step one, the burden was on Drinnon to establish that his mental condition was an impairment. Although Drinnon did list "depression" as one of his seven impairments in his application for benefits, in that same application he represented that he did not have a mental condition that affected his activities and did not get treatment for it.[40] He also did not thereafter raise it as an issue before the ALJ. While there was more than a scintilla of evidence in the record that he

---

[38]  My summary of those citations is attached hereto as Appendix 1.

[39]  Kalafut, Tr. 221; Endsley, Tr. 233; and Heath, Tr. 338.

[40]  Tr. 141.

suffered from depression, Drinnon never presented any evidence that his depression caused him any non-exertional limitation in performing any work. I find that the references in the record are insufficient in character and content to trigger the duties of the AlJ to order a consultive evaluation or to further develop the record because Drinnon never requested a consultive examination. I find that the there is sufficient evidence in the record that Drinnon's depression was controlled medicinally.

### Recommendations

Based upon the foregoing findings and conclusions, I recommend to the District Court that the decision of the Commissioner be reversed and that this cause be remanded for a determination of whether or when the claimant's disability that commenced on October 7, 2007 may have ceased; and if not ceased, then for a determination of the amount of the benefit to which plaintiff is entitled under the law and rulings of this court.

It is so ORDERED, this 29th day of November, 2011.

_Robert K. Roach_
Robert K. Roach
UNITED STATES MAGISTRATE JUDGE

### Standard Instruction to Litigants

A copy of this report containing findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of this order, report, findings and recommendations must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding, conclusion or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**Appendix 1**

Plaintiff's Transcript Citations to Mental Issues

221  Kalafut, DO-Exam for neck and left upper extremity radicular pain; notation in <u>Past Medical History</u>-"Nerve problems, psychiatric problems." 1-4-08
233  Endsley, DO-Exam for improvement and impairment rating-Note on <u>Past Medical History</u>; "Depression" Medication: Current Medication: "Prozac" 10-12-07
338  Heath, MD-Exam for neck and back-<u>Past Medical History</u>-"depression" 8-04-08
     (no <u>diagnosis</u> related to mental impairment)
342  Syed, MD -Disability Determination-"Anxiety+, Irritability+, Mood Swings+, Depression+" 6-16-08
343  Syed, MD Medications: "Prozac" 6-16-08
346  Syed, MD Subjective: patient here for lab work; "Prozac"    Undated
347  Syed, MD Assessement:   "Anxiety(+),Depression(+)  Undated
349  Syed, MD Medications:  "Prozac" undated
351  Syed, MD Subjective: "more depressed"; Plan: "Increase Prozac" 8-8-08
353  Syed, MD Assessment: "ADD" 9-22-08
354  Syed, MD Difficulty concentrating-increase Vyvanse 10-27-08
358  Syed, MD -Disability Determination-"Anxiety+, Irritability+, Mood Swings+, Depression+"            Undated
359  Syed, MD <u>Medications</u>:  "Prozac"Undated
395  Syed, MD-Subjective <u>Complaint</u>: ...Depression...; Psych:   "Anxiety+, Irritability+, Mood Swings+, Depression+"Emotional Stress+, etc." 12-28-06
396  Syed, MD-<u>Assessment</u>:  "Anxiety+,  Irritability+,  Mood Swings+, Depression+"12-29-06
406  Syed, MD-Assessment:"Anxiety+, Irritability+, Mood Swings+, Depression+" Circa 2-25-08 and 2-28-08 per notes.
411  Syed, MD.  -"Add Prozac daily"  "Prozac 20 mg take one daily"   4-17-08
420  Syed, MD. "more depressed"; "increase Prozac to 40 mg daily"   8-24-08
444  Syed, MD. Subjective 4. "Depression"; Psych:...Depression...; Psych: "Anxiety+, Irritability+, Mood Swings+, Depression+"Emotional Stress+, etc." 12-28-06
465  Syed, MD-Assessment:"Anxiety+, Irritability+, Mood Swings+, Depression+"3-11-09
466  Syed, MD Medications: "Prozac"     3-11-09

18